United States District Court
Southern District of New York
-----------------------------------X
MARIA A. TORRES-SYLVAN,

                Plaintiff,

     -against-                 01 Civ. 0343 (DAB)
                                  <u>MEMORANDUM & ORDER</u>
AMERICAN CIVIL LIBERTIES UNION,
ADRIENNE STEIN, individually and in
her official capacity as a Director
of the American Civil Liberties Union,

                Defendants.
-----------------------------------X
DEBORAH A. BATTS, United States District Judge.

Maria A. Torres-Sylvan ("Plaintiff") brings this action for damages and equitable relief, pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 <u>et</u> <u>seq.</u>; 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) <u>et</u> <u>seq.</u> ("Title VII"); the New York State Human Rights Law, N.Y. Executive Law §§ 290 <u>et</u> <u>seq.</u>; and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-107.[1] Plaintiff alleges that Defendants, the American Civil Liberties Union ("ACLU") and Adrienne Stein ("Stein") (collectively, "Defendants"), discriminated against Plaintiff on the basis of

_____

    [1] Plaintiff's Second Amended Complaint also includes a claim for intentional infliction of emotional distress and respondeat superior, but Plaintiff concedes in her opposition to summary judgment that her intentional infliction of emotional distress claim should be dismissed. Accordingly, the claims for intentional infliction of emotional distress and for respondeat superior, which is based on her tort claim of intentional infliction of emotional distress, are dismissed with prejudice.

her race and her age.  Defendants move, pursuant to Fed. R. Civ.
P. 56, for Summary Judgment.  For the reasons stated below,
Defendants' Motion for Summary Judgment is GRANTED.


## I. BACKGROUND

Plaintiff is Hispanic and was born June 13, 1950.  (Second
Am. Compl. ¶ 12.)  She was employed by the ACLU from 1983 to
2000. (Second Am. Compl. ¶ 16; Defs.' Ans. to Second Am. Compl.
¶¶ 17, 35.)  The ACLU is a not-for-profit organization, which
protects civil liberties, with its headquarters in New York City.
(Id. at ¶ 13; Defs.' Ans. to Second Am. Compl. ¶ 14; Defs.' Mem.
Law at 5.)  Defendant ACLU employs more than 20 people.  (Second
Am. Compl. ¶ 13; Defs.' Ans. to Second Am. Compl. ¶ 14.)
Defendant Adrienne Stein was hired as Director of the ACLU's
Management Information System ("MIS") department in January of
1998. (Second Am. Compl. ¶¶ 14, 23; Defs.' Ans. to Second Am.
Compl. ¶ 24.)  Stein was born in 1963 in Uruguay.  (Stein Decl. ¶
2.)


## A. Plaintiff's Employment

Plaintiff began working at the ACLU as a Data Entry
Operator in 1983, and in February of 1986, her position changed
to Computer Operator.  (Defs.' 56.1 Stmt. ¶ 1; Pl.'s 56.1 Resp. ¶

2

1.) The parties dispute the extent of Plaintiff's job
responsibilities, but agree that her duties as Computer Operator
included: (1) running membership batch jobs for the National
office and updating the member/donor database; (2) generating
affiliate data files and mailing labels, and encrypting and
copying the data files onto a CD or diskette for transfer to the
affiliates; (3) and systems operations, including performing
daily backups of the Hewlett Packard System, moving and restoring
data files from tapes, and monitoring disk space.  (Defs.' 56.1
Stmt. ¶ 19; Pl.'s 56.1 Resp. ¶ 19.)  Plaintiff alleges, and
Defendants do not deny, that Plaintiff performed her duties in a
satisfactory manner.  (Second Am. Compl. ¶ 18; Pl.'s 56.1 in Opp.
¶¶ 55, 72-75.)

B. Computer Operator Job Title

Plaintiff's position changed from Data Entry Operator to
Computer Operator in February of 1986.  (Defs.' 56.1 Stmt. ¶ 1;
Pl.'s 56.1 Resp. ¶ 1.)  Plaintiff alleges that instead of
Computer Operator, her job title actually was Junior Computer
Operator, and that the title of the other Computer Operator, Ana
Maria Aponte ("Aponte")[2] was Senior Computer Operator. (Pl.'s

_____

[2] Aponte is Hispanic.  (Hairston Dep. at 50, 117.)

56.1 Resp. ¶ 5.)  According to Plaintiff's supervisor, Computer Operations Manager Kenneth Hairston ("Hairston"), these designations appeared on Plaintiff's and Aponte's job performance evaluations.  (Hairston Dep. at 53-54; Torres' Dep. at 12.)  According to Defendants, however, the "senior" and "junior" designations were informal labels (Defs.' Mem. Law at 7) and from May 6, 1985 through June 27, 2000, the ACLU did not recognize the titles of "junior" and "senior" officially, but instead only recognized the title of "computer operator" for both employees.  (Defs.' 56.1 Stmt. ¶¶ 5-6.)  Although Defendants admit that Aponte received a higher salary than Plaintiff, they attribute this difference to the fact that Aponte had worked at the ACLU for a longer period of time.  (Defs.' 56.1 Stmt. ¶ 8.)  When Aponte resigned in September of 1998, Plaintiff assumed many of the responsibilities that had previously been handled by Aponte.  (Stein Decl. ¶ 13.)  At that time, Plaintiff requested a title change from Junior to Senior Computer Operator and a raise.  (Stein Decl. ¶ 13; Torres' Dep. at 56.)  Plaintiff's request for the title change was not granted. (Stein Decl. ¶ 13; Torres' Dep. at 56-8.)  However, Defendant Stein requested that Plaintiff's salary be increased by three percent, and this request was granted by Director of Finance and Administration Alma Montclair ("Montclair").  (Defs.' 56.1 Stmt. ¶ 8; Pl.'s 56.1 Resp. ¶ 8.)

4

## C. Transition to New Computer System

While Plaintiff was employed at the ACLU, the organization used a Hewlett Packard ("HP") mainframe computer system to track member and donor information. (Defs.' 56.1 Stmt. ¶ 13; Pl.'s 56.1 Resp. ¶ 13.) In December of 1998, according to Stein, the ACLU decided to eliminate the HP System, which is a COBOL-based program operated on a mainframe computer. (Defs.' 56.1 Stmt. ¶¶ 14, 16; Pl.'s 56.1 Resp. ¶¶ 14, 16.) The ACLU decided to replace the HP system with a Windows-based fundraising software program, called Team Approach, which can be installed onto individual personal computers. (Stein Decl. ¶¶ 14-15.) "Restructuring meant, in the MIS department at the time, [sic] had to do with what changes were needed given the fact that one computer system was being eliminated and a new computer system was being put in place, and therefore the needs of the department would be different, could possibly be different." (Stein Dep. at 85.) According to the Defendants, the ACLU replaced the HP System with Team Approach in June of 2000. (Defs.' 56.1 Stmt. ¶¶ 14-16.)

The ACLU offered training in Team Approach for employees in May and July of 2000. (Defs.' 56.1 Stmt. ¶ 58; Pl.'s 56.1 Resp. ¶ 58.) Plaintiff was not invited to attend the training. (Defs.' 56.1 Stmt. ¶ 60; Pl.'s 56.1 Resp. ¶ 60.) Out of the MIS

department employees who were employed in 1999, five attended Team Approach training in 2000,[3] and five employees did not. (Stein Dep. at 92.) The employees who attended were "the people who support Team Approach and people who run various tasks in Team Approach." (Stein Dep. at 91.)

### D. Plaintiff's Termination

In light of the decision to eliminate the HP System, in the fall of 1999, Stein decided to create the position of an Administrative Assistant in the MIS Department. (Defs.' 56.1 Stmt. ¶ 23; Pl.'s 56.1 Resp. ¶ 23.) In a meeting in October of 1999, Stein informed Director of Finance and Administration Montclair, that the position of Computer Operator was no longer justified and should be eliminated, with which Montclair agreed.[4]

_____

[3] The employees who attended Team Approach training included Sylvern Huckleman, Donna Prendergast, Garfield Dilworth, Judith Nery and Ken Hairston. (Stein Dep. at 91-92.)

[4] Specifically, Stein said,
> In October 1999, I met with Montclair to discuss organizational changes that I thought should be made in the MIS Department with the advent of Team Approach. At the meeting I explained to Montclair that because of the changes associated with Team Approach the position of Computer Operator was no longer justified. Specifically, regarding Torres' duties, I explained to Montclair that many of the regular reports that were being run for the National Office by Computer Operations would instead be run by the Membership Department under Team Approach, that the conversion

6

(Defs.' 56.1 Stmt. ¶ 27; Pl.'s 56.1 Resp. ¶ 27.)  At the same meeting, Stein proposed creating the position of MIS Assistant, with which Montclair also agreed.  (Defs.' 56.1 Stmt. ¶¶ 29-30; Pl.'s 56.1 Resp. ¶¶ 29-30.)  The MIS Assistant position was posted after April 12, 2000.  (Defs.' 56.1 Stmt. ¶ 37; Pl.'s 56.1 Resp. ¶ 37.)  Stein submitted a memorandum to Ira Glasser ("Glasser"), Executive Director of the ACLU, and to Montclair, dated December 8, 1999, proposing to eliminate the Computer Operator position, as well as the HP Programmer position in the MIS Department.  (Defs.' 56.1 Stmt. ¶ 33; Defs.' Exhbt B; Pl.'s 56.1 Resp. ¶ 33.)

On or about April 10, 2000, Defendant Stein and Montclair informed Plaintiff that her position would be eliminated, effective June 30, 2000, due to planned restructuring.  (Defs.' 56.1 Stmt. ¶ 39; Pl.'s 56.1 Resp. ¶ 39.)  At the time she was terminated, Plaintiff was 50 years old.  (Second Am. Compl. ¶ 12.)  Also laid off as a result of the alleged restructuring was the Programmer/Analyst for the HP System, Shlomoh Sherman.

---

process involved in sending data files to the Affiliates would be eliminated, and that systems operations of Team Approach would be handled by the PC-network staff.  I also told Montclair that very few of the duties of the Computer Operations Manager would be affected by the implementation of Team Approach.  (Stein Decl. ¶ 30.)

(Stein Decl. ¶ 20.)  Sherman was born in 1937 and is Caucasian. (Gustaffson Decl. ¶ 11.)  Plaintiff did not receive information about her termination in writing, and was not informed of the grievance procedure for contesting termination.  (Pl.'s 56.1 Stmt. ¶¶ 193, 221; Stein Dep. at 186-87.)

According to Defendants, Montclair prepared a Severance Memorandum for Plaintiff on or about May 1, 2000 that explained the severance packages available to her. (Montclair Decl. ¶ 21; Director of Human Resources Linda Gustaffson Decl. ¶ 4.)  On May 23, 2000, Stein asked Plaintiff which severance package she would be accepting.  (Torres' Dep. at 137).  Plaintiff informed her she had never received information about the severance options. (Id.)  Stein then explained there had been a miscommunication about who was supposed to give Plaintiff the severance memorandum, and she gave it to Plaintiff later that day. (Torres' Dep. at 136-137.)  Plaintiff never signed the memorandum and never had another discussion with Stein, Montclair, or Director of Human Resources Linda Gustaffson about the severance package.  (Torres' Dep. at 146.)  Because she took vacation, Plaintiff's last day of work at the ACLU was June 9, 2000. (Torres' Dep. at 147.)

## E. MIS Assistant Position

At Plaintiff's termination meeting, Stein informed Plaintiff of the planned posting for the MIS Assistant position, and told Plaintiff that she could apply for it if she was interested. (Defs.' 56.1 Stmt. ¶ 39; Pl.'s 56.1 Resp. ¶ 39.) A few days later, Stein gave Plaintiff the posting for the MIS position and a handwritten note that stated, "Maria--Here is the job description we mentioned to you last week. FYI. Adrienne." (Defs.' 56.1 Stmt. ¶ 41; Def. Exhbt C; Pl.'s 56.1 Resp. ¶ 41.)

The job posting for the MIS Assistant position listed the responsibilities as: (1) assisting users with computer application questions; (2) initiating and tracking computer purchases; (3) under the supervision of the Database Services Manager, encrypting and copying files to various electronic media for distribution to affiliates according to pre-established procedures; (4) coordinating meetings and training classes; (5) receiving, forwarding, and logging computer support requests; (6) organizing technical documents; (7) general administrative support to the department; and (8) special projects as assigned. (Defs.' 56.1 Stmt. ¶ 44; Pl.'s 56.1 Resp. ¶ 44; Def. Exhbt D.)

Plaintiff did not apply for the MIS Assistant position. (Defs.' 56.1 Stmt. ¶ 42; Pl.'s 56.1 Resp. ¶ 42.) According to Defendants, Stein and Hairston interviewed four out of 24

applicants for the MIS Assistant position, and they decided that Eli Jacobowitz ("Jacobowitz") was the best candidate for the position.  (Stein Decl. ¶ 39.)  According to Stein, she prepared and submitted a hiring request memorandum, dated May 26, 2000, and she received approval from Montclair to hire Jacobowitz on May 31, 2000.  (Stein Decl. at ¶¶ 40-41.)  Jacobowitz, a white male, age 23, accepted the job. (Second Am. Compl. ¶ 55; Stein Exhbt D.)  He began working at the ACLU in June of 2000.  (Stein Decl. at ¶ 41.)

The memorandum from Linda Gustaffson to Adrienne Stein, granting approval to hire Jacobowitz, is dated April 20, 2000. (Pl. Exhbt 26.)  However, Defendants allege that the date on the Memo is an error, and that all other documents related to Jacobowitz make clear that he was not officially hired until after May 31, 2000.[5]  (Gustaffson Reply Decl. ¶ 11 and Exhbts A-F.)  Jacobowitz stated in his deposition that the first contact

---

[5] In her reply declaration, Gustaffson states that the date of April 20, 2000 originally appeared on a cover memorandum concerning the hiring of "Dina Vaz."  (Gustaffson Reply Decl. ¶ 9; Reply Decl. Exhbt A.)  Gustaffson states that subsequent to that date, the April 20, 2000 date mistakenly appeared on several hiring memoranda that she prepared pertaining to new employees. She said, "[b]ecause of the malfunctioning automatic updating feature, I sent out at least five Hiring Packets that contained Cover Memoranda that were incorrectly dated April 20, 2000. One of the incorrectly dated Cover Memoranda that I created was included in the Hiring Packet that I sent to Stein in connection with the hiring of Jacobowitz." (Gustaffson Reply Decl. ¶ 11.)

he made with the ACLU was in an email, dated May 9, 2000, responding to the job posting on a website. (Jacobowitz Dep. at 36-37.)

## F. Other Employees Whose Positions Were Eliminated

Plaintiff lists other employees whom she alleges received new positions without applying for them. These informal job changes upon which Plaintiff relies occurred from 1974 to 1998. At the time her position was eliminated in 2000, so was Shlomoh Sherman's, who was the Programmer/Analyst for the HP System. (Stein Decl. ¶ 20.) Linda Gustaffson's job changed from Assistant to the Director of Administration and Finance, to Office Administrator, a job for which she interviewed. (Gustaffson Dep. at 15-16, 20.) When that position was eliminated, she was given the newly created position of Director of Human Resources in 1997 or 1998, without formally applying for it. (Gustaffson Dep. at 20-21.) Gustaffson who is a Caucasian, born October 9, 1959, stated that "Every new title that I received was given to me after I had already assumed the responsibilities for quite a period of time." (Gustaffson Dep. at 15.)

Kenneth Hairston, an African-American born March 1, 1949,

who started at the ACLU in a temporary clerical position, was given the newly created position of Data Processing Assistant in 1975 without having to apply for it formally. (Hairston Dep. at 12.) Hairston became Data Processing Manager in 1979 or 1980 without formally applying for the position. (Id. at 13-14.) Hairston then received the new title of Director of Data Processing in 1985 or 1986, which was a new position for which he did not apply. (Id. at 17.)

Sylvern Huckleman's title changed from Data Entry person to Data Entry Supervisor in 1985 or 1986 without a formal application process. (Huckleman Dep. at 8-11.) Huckleman is African-American and was born on January 4. 1943. (Id. at 12.)

G. ACLU's Affirmative Action Program

The ACLU had a written affirmative action plan ("AA Plan") in place from May 1985 through 2000, which required that all staff members be notified of all job openings. (Defs.' 56.1 Stmt. ¶¶ 10-11; Pl.'s 56.1 Resp. ¶¶ 10-11; Montclair Exhbt A.) Montclair has been employed by the ACLU since 1985. (Montclair Decl. ¶ 4.) She was appointed the Affirmative Action Officer in 1994 and is responsible for overseeing the implementation of the organization's AA Plan. (Montclair Decl. ¶ 7.) According to Montclair, the job-posting requirement previously had not been

strictly followed; therefore, when she began working at the ACLU,
she developed procedures for supervisors to follow when filling
new and vacant positions, which have been enforced since 1987.
(Montclair Decl. ¶ 7.)


H. Affirmative Action and Hiring Procedures

The ACLU follows guidelines set forth in an Interoffice
Memorandum dated June 11, 1995, from Alma Montclair, to assist
directors, supervisors, and management with posting, recruiting
and hiring new employees, in keeping with the organization's
affirmative action plan. (Gustaffson Dep. at 232; Pl.'s Exhbt
27.) The Memorandum includes guidelines for updating job
descriptions, and specifically states that after one has obtained
approval to begin the recruiting process, an existing job should
be reviewed or a new description should be composed. (Pl.'s
Exhbt 27.) The Memorandum also explains that job descriptions,
which are on file in Linda Gustaffson's office "should be
reviewed to determine whether any changes need to be made to
tailor the description to the current requirements." (Id.) It
further directs that those changing job descriptions should work
with Linda to make said changes. (Id.) According to the
Memorandum, if job changes are made, the new description is to be

forwarded to Montclair so that "I may assess any changes for consistency with our Affirmative Action program." (Id.) Gustaffson never revised Plaintiff's job description (Gustaffson Dep. at 187), but she did so for several positions in the MIS department. (Id. at 235-39.)


I. ACLU Policy #527

ACLU policy #527 is labeled "General Personnel Policies," and section III(C), which pertains to employment rights of non-senior ACLU staff who are laid off for budgetary or staff reorganizational issues, states:

> An employee may be laid off for staff reorganizational or budgetary reasons, but such employee shall have first priority for rehiring if the position or a substantially similar one becomes vacant within six months. An employee who believes that reorganizational or budgetary reason is pretextual may challenge those reasons pursuant to the hearing procedures set forth in Section B [Procedures for Termination] above. The hearing shall be for the sole purpose of determining whether the layoff was, in fact, for staff reorganization or budgetary reasons.

(Pl. Exhbt 25.) Section III(B) of the policy is labeled "Procedures for Termination," and it requires that employees be given written notice of their termination and also provides employees with the right to a hearing within 30 days of such a request, and a decision by the hearing panel or arbitrator within

14

15 days of the hearing. (_Id._)  Plaintiff was not provided with a written reason for her termination. (Torres Dep. at 104; Stein Dep. at 186.)  Plaintiff was never provided with information about the grievance procedure.  (Gustaffson Dep. at 199; Stein Dep. at 187.)  According to Defendant Stein and Gustaffson, the requirement that an employee be given a written reason for termination did not apply to situations involving termination due to restructuring.  (Stein Dep. at 186; Gustaffson Dep. at 200-01.)  However, according to Gustaffson, if an employee were laid off due to budgetary or reorganizational reasons, he or she could request a hearing under the #527 policy without the reason for termination in writing.  (Gustaffson Dep. at 205.)

**J. Plaintiff's EEOC Charges and Lawsuit**

Plaintiff timely filed her complaint with the Equal Employment Opportunity Commission ("EEOC").  (Second Am. Compl. ¶ 10.)  Plaintiff received a "Notice of Right to Sue" from the EEOC on or about November 6, 2000.  (Second Am. Compl. ¶ 10; Defs.' Ans. to Second Am. Compl. ¶ 11.)  Plaintiff timely filed this lawsuit on January 17, 2001.

## II. DISCUSSION

Defendants move, pursuant to Fed. R. Civ. P. 56, for summary judgment on all claims, alleging that Plaintiff has not pled a prima facie case of discrimination and there is no evidence that their proffered explanations for their employment decision are pretextual. (Defs.' Mem. Law at 2-3.) Plaintiff argues that numerous genuine issues of material fact exist, which should preclude the granting of Defendants' motion for summary judgment. (Pl.'s Mem. Law at 2.)

### A. Summary Judgment

Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986); Corselli v. Couglin, 842 F.2d 23, 25 (2d Cir. 1988).

Under Fed. R. Civ. P. 56(c), "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has interpreted this to

mean that, "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

As a general rule, "the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions . . . in the light most favorable to the party opposing the motion".  Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir. 1995); see also Consarc Corp., 996 F.2d at 572.  All ambiguities and all inferences drawn from the underlying facts must be resolved in favor of the party contesting the motion, and all uncertainty as to the existence of a genuine issue for trial must be resolved against the moving party.  LaFond v. General Physics Servs. Corp., 50 F.3d 165, 171 (2d Cir. 1995).  As is often stated, "[v]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate."  Binder v. LILCO, 933 F.2d 187, 191 (2d Cir. 1991).

**B. Title VII**[6]

Title VII of the Civil Rights Act of 1964 provides, in relevant part:

It shall be an unlawful employment practice for an employer--(1) . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

A complainant in a Title VII action carries the initial burden of establishing a prima facie case of discrimination. Reeves v. Sanderson Plumbing Prods, Inc., 530 U.S. 133, 142 (2000); Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). The burden of establishing a prima facie case is de minimis. Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994). To establish a prima facie case of employment discrimination, plaintiff must show: (1) membership in a protected class; (2) satisfactory job performance; (3) termination from employment or other adverse employment action; and (4) that the adverse action took place under circumstances

---

[6] The analysis under Title VII also is applicable to Plaintiff's New York State Human Rights Law and New York City Human Rights Law claims (see Dawson v. Bumble & Bumble, No. 03-7180, 2005 U.S. App. LEXIS 2777 (2d Cir. Feb. 17, 2005)) and to Plaintiff's 42 U.S.C. § 1981 claim. See Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 146 (2d Cir. 1999).

18

giving rise to an inference of discrimination.  <u>See, e.g.,</u>
<u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 42 (2d Cir. 2000);
<u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 567 (2d Cir. 2000).

   If a plaintiff successfully demonstrates these elements, a
presumption of unlawful discrimination is created. <u>Chertkova v.</u>
<u>Connecticut General Life Ins. Co.</u>, 92 F.3d 81, 87 (2d Cir. 1996)
(citing <u>Texas Dep't of Cmty Affairs v. Burdine</u>, 450 U.S. 248, 254
(1981)).  The burden then shifts to the defendant to articulate
some "legitimate, nondiscriminatory reason" for the adverse
employment action taken against the plaintiff.  <u>Burdine</u>, 450 U.S.
at 253; <u>Chertkova</u>, 92 F.3d at 87.  If the defendant articulates a
legitimate reason for the adverse action, the burden switches
back to the plaintiff to show that the defendant's stated reason
was merely a pretext for discrimination.  <u>Id.</u>  "The ultimate
burden of persuading the trier of fact that the defendant
intentionally discriminated against the plaintiff remains at all
times with the plaintiff."  <u>Burdine</u>, 450 U.S. at 253.

   A plaintiff cannot defeat summary judgment by asserting mere
conclusory allegations of discrimination.  <u>Meiri v. Dacon</u>, 759
F.2d 989, 998 (2d Cir. 1985) (holding that "mere incantation of
intent or state of mind [cannot] operate as a talisman to defeat
an otherwise valid motion").  However, "where intent is genuinely
in issue . . summary judgment remains available to reject

discrimination claims in cases lacking genuine issues of material fact." <u>Chambers</u>, 43 F.3d 29 at 40 (citation omitted). Therefore, where the defendant has offered a legitimate nondiscriminatory reason for an adverse employment action, the plaintiff must present "sufficient evidence to find that the employer's asserted justification is false [and] to conclude that the employer unlawfully discriminated." <u>Reeves</u>, 530 U.S. 133, 148.

Whether summary judgment is appropriate in a particular case depends upon "the strength of the plaintiff's <u>prima</u> <u>facie</u> case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered."[7] <u>Id.</u> at 148-49; <u>see also</u> <u>Schnabel v. Abramson</u>, 232 F.3d 83, 90 (2d Cir. 2000) (holding that "<u>Reeves</u> clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" (quoting <u>Reeves</u>, 530 U.S. at 143)). However, where a plaintiff establishes a <u>prima</u> <u>facie</u> case and presents some evidence of pretext, summary judgment may still be

_____

[7] <u>Reeves</u> was decided under Fed. R. Civ. P. 50 (not Rule 56 as in the instant case), however "the inquiry under each is the same." <u>Reeves</u>, 530 U.S. at 150.

appropriate where, for instance, the record conclusively reveals a nondiscriminatory reason for the employer's action, or where the plaintiff creates "only a weak issue of fact" on the issue of pretext and there exists "abundant and uncontroverted independent evidence that no discrimination [has] occurred." Schnabel, 232 F.3d at 90 (quoting Reeves, 530 U.S. at 148) (internal quotations omitted). The question on a summary judgment motion in a discrimination case is "whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination. To get to the jury, it is not enough . . . to disbelieve the employer; the fact finder must [also] believe the plaintiff's explanation of intentional discrimination." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 519 (1993)).

## C. ADEA

The ADEA, which protects individuals who are at least 40 years old (29 U.S.C. § 631(a)), forbids employers from discriminating against employees by discharging them based on their age. 29 U.S.C. § 623(a)(1). The well established burden-shifting analysis under Title VII, discussed above, also is applicable to an ADEA claim. See Raskin v. Wyatt Co., 125 F.3d 55 (2d Cir. 1997).

D. <u>Prima</u> <u>Facie</u> Case

As a Hispanic person who was age 50 at the time her
employment was terminated, Plaintiff is a member of two protected
classes, and thus clearly meets the first prong of establishing a
<u>prima</u> <u>facie</u> case of discrimination.  Second, there is no dispute
regarding whether Plaintiff was qualified for her position of
Computer Operator.  Third, it is well established that
termination of one's employment constitutes an "adverse
employment action," and this element is undisputed.  The fourth
prong that the Plaintiff must demonstrate--that the circumstances
surrounding her firing give rise to an inference of
discrimination--is the only one in question.

Defendants argue that Plaintiff was fired because her
primary job responsibilities disappeared with the implementation
of Team Approach.  (Defs.' Mem. Law at 32.)  Viewing the
submissions in the light most favorable to the nonmovant, as the
Court must under the summary judgment standard, it appears that
Plaintiff makes six arguments[8] to demonstrate that the

---

[8] In addition to these six arguments, Plaintiff argues that
Montclair shirked her responsibilities as the Affirmative Action
Officer, which "raises the inference that plaintiff was
terminated because of her age and race."  (Pl.'s Opp Mem. at 27.)
Plaintiff provides no evidence for this statement, and because
"unsupported allegations do not create a material issue of fact"
(<u>Weinstock v. Columbia</u>, 224 F.3d 33, 41 (2d Cir. 2000)), the
Court declines to address this point.

circumstances surrounding her termination gave rise to an inference of discrimination.  These will be addressed in turn.

## 1. Job Title/Promotion

Plaintiff argues that Defendant Stein's refusal to "promote" her from "Junior Computer Operator" to "Senior Computer Operator" in 1998 when Aponte, who was the "Senior Computer Operator," left the ACLU, raises an inference of race and age discrimination because she was denied a job title that accurately reflected her additional job responsibilities.  (Pl.'s Opp. Mem. at 13.) Defendants argue that both Aponte and Plaintiff were officially "Computer Operators" and that the "senior" and "junior" designations were never formally recognized at the ACLU, and that

_____

Plaintiff also alleges that the fact that she was repeatedly urged to sign a severance package supports an inference of discrimination. (Second Am. Compl. ¶ 38.)  She takes issue with the fact that her severance agreement was dated June 30, 2002, which was also Plaintiff's termination date, and which she claims shows she had a restricted time period in which to review the document and thus, was unable to negotiate or challenge it. (Pl.'s Opp Mem. at 25.)  Plaintiff never signed the agreement (Defs.' Mem. Law at 42; Second Am. Compl. ¶ 39) and Plaintiff's own testimony indicates she was given the severance document on May 23, 2000, well before her effective termination date, showing she had ample time to review it. (Pl.'s 56.1 Stmt ¶ 219.) Furthermore, even if she felt pressure from the Defendants to sign the agreement, Plaintiff cites no evidence that such pressure was caused by race or age discrimination.

Montclair, and not Stein, would have had to approve such a designation. (Defs.' Mem. Law. at 12; Defs.' 56.1 Stmt. ¶ 2.) Plaintiff alleges that there is a genuine issue of material fact as to who had authority to change Plaintiff's job title, and also as to whether the "senior" and "junior" Computer Operator titles were official ACLU titles. (Pl.'s Opp. Mem. at 10-15.) The Court agrees that there are disputes as to who had the power formally to change Plaintiff's job title, and as to whether the titles were official or not. However, even assuming Plaintiff is correct, that the titles were recognized and Stein had the authority to change her title and purposefully rejected Plaintiff's request, such actions cannot be construed as raising an inference of discrimination. Contrary to what Plaintiff alleges, she was not given a "less distinguished" title by the change in her job title from "Junior Computer Operator" to "Computer Operator." (Pl.'s Opp Mem. at 13.) Indeed, some would view the title change as a promotion. Also, it would appear to the Court that once Aponte (who is Hispanic) (Hairston Dep. at 50, 117) resigned and Plaintiff was the only Computer Operator left, any title prefix was unnecessary. Furthermore, any inference of discrimination is removed by the fact that Defendant gave Plaintiff a raise in recognition of her increased job duties. Even viewing the facts in the light most favorable to

the nonmoving party, Stein's refusal to give Plaintiff a new job title, while at the same time not demoting her, and while also giving her a raise, cannot serve as an example of Defendants' discriminatory practices.[9]

## 2. Violation of ACLU Policies

Plaintiff makes several arguments as to how Defendants violated ACLU policies, which she argues show inferences of race and age discrimination.[10]

---

[9] Plaintiff also argues in her Opposition to Summary Judgment that the denial of the new job title should be considered an adverse employment action. (Pl.'s Opp. Mem. at 16.) For the same reasons expounded upon above, the removal of the prefix "junior" from her "Computer Operator" title was not a materially adverse change, and the fact that she received a raise with the new title quells any notion that she was in fact demoted.

[10] Along similar lines, Plaintiff also argues that race and age discrimination can be inferred by the fact that the Defendants deviated from company policy by granting Jacobowitz an interview based on his resume and a cover letter, "because they wanted to terminate plaintiff and hire a younger white employee." (Pl.'s Opp. Mem. at 51.) Plaintiff argues that a cover letter is a document outside the scope of those documents that can be used by the ACLU to assess qualifications. The Court declines to address the merits of this dubious argument. Because Plaintiff did not apply for the MIS Assistant position, and because her Complaint is based on her termination as a Computer Operator, any deviation from company policy in the hiring of the new position is irrelevant and cannot serve to show an inference of discrimination against Plaintiff, who was fired before Jacobowitz was hired.

**a. Updating Plaintiff's Job Description**

First, Plaintiff argues that Defendants had an obligation, under the 1995 Affirmative Action and Hiring Procedures Memorandum, to update Plaintiff's job description to reflect more accurately the changes to her job duties, and that no changes to her job description were made since 1986. (Pl.'s Opp Mem. at 17.) Plaintiff argues that Defendant Stein did not inform Director of Human Resources Gustaffson of Plaintiff's additional Computer Operator duties and that Gustaffson did not take it upon herself to become aware of Plaintiff's increased duties. (Pl.'s Opp Mem. at 18.) Defendants counter that the Memorandum cited by Plaintiff specifically refers to updating job descriptions as part of the recruiting process for vacated positions. (Defs.' Reply Mem. at 30.) Defendants state that "the purpose of these Procedures is to ascertain that job postings accurately reflect the requirements of the vacant position," and Plaintiff's Computer Operator job was never vacant. (Defs.' Reply Mem. at 30-31.)

**b. Failure to Provide Written Statement of Termination**

Plaintiff also argues that Defendants' failure to provide a written statement of the reasons for her termination, in violation of internal policy, suggests evidence of discrimination. (Pl.'s 56.1 Stmt. ¶¶ 190-208.) The parties agree

that Defendants did not give Plaintiff a written explanation for her discharge, which Plaintiff argues was not in compliance with ACLU Policy #527. (Pl.'s Opp Mem. at 20; Pl.'s Exhbt 25.) Plaintiff claims that this deviation from protocol suggests race and age discrimination. (Pl.'s Opp Mem. at 21.) Director of Human Resources Linda Gustaffson stated that under ACLU policy #527, the ACLU is not required to give notice in writing when an individual is laid off for budgetary or staff reorganizational issues. (Gustaffson Dep. at 200-202.) She stated that the policy only requires that a reason for termination be in writing for reasons of misconduct, and specifically, "if there is just cause, misconduct or inadequate job performance." (Gustaffson Dep. at 200.) Therefore, Defendants argue that their failure to provide Plaintiff with written documentation of the reasons for Plaintiff's termination, which was not based on any of those reasons, is not evidence of discrimination. (Defs.' Mem. Law at 45.)

c. Lack of Consideration for Rehiring

Plaintiff also argues that ACLU Policy #527 states that an employee who is laid off for staff reorganization or budgetary reasons shall have first priority for rehiring if the position or "a substantially similar one becomes vacant within six months." (Pl.'s Opp Mem. at 27; Pl.'s Exhbt 25.) Plaintiff argues that

Gustaffson, Montclair, and Stein did not take any actions to make rehiring Plaintiff a priority, and did not contact Plaintiff during the six months after her last day, thus suggesting discrimination. (Pl.'s Opp Mem. at 28-9; Pl.'s 56.1 Stmt. ¶¶ 230-240.) Defendants argue that they did not violate this policy, because no positions became available. (Defs.' Reply Mem. Law at 28; Gustaffson Dep. at 175.)

d. Denial of Grievance Procedure

Plaintiff also argues, and Defendants do not deny, that she was not informed of the possibility to appeal her dismissal and go before the grievance committee, as permitted under ACLU Policy #527. (Pl.'s Opp Mem. at 21.)

All of these alleged violations of company policies may be construed as "departures from procedural regularity" which can raise a question of discrimination, "where the departure may reasonably affect the decision." Weinstock v. Columbia Univ., 224 F.3d 33, 45 (2d Cir. 2000) (quoting Stern v. Trustees of Columbia Univ., 131 F.3d 305, 313 (2d Cir. 1997)). Such procedural irregularities must be made in the context of a decision to terminate a plaintiff's employment to infer discrimination. See Pellegrino v. County of Orange, 313 F.Supp. 2d 303, 320 (S.D.N.Y. 2004) (holding that discriminatory intent could not be inferred from employer's failure to follow proper

procedures in terminating plaintiff, where the decision to terminate employee took place well before the procedural irregularities occurred).

The ACLU policy #527 is by no means clear as to how or whether an employee who falls victim to reorganization may appeal a termination decision, and the administrative flaws associated with her termination certainly are unprofessional.  But even viewing the facts in Plaintiff's favor, it is unclear how Defendants discriminated against her, based on age or race, by not updating her job description, not providing her with a written statement of termination, not making her a hiring priority, and not informing her of her right to an appearance before a grievance committee.  Even if the procedures had been followed as interpreted by Plaintiff, there is no indication that doing so would have affected the ACLU's decision to restructure the MIS Department and terminate the Computer Operator position, decisions that occurred months before she was told she was fired.  None of these deviations from procedural norms raise an inference of selective treatment which a jury could construe as discrimination.  Furthermore, Plaintiff does not identify other similarly situated (or any) employees who were treated differently than she was.  Indeed, there is no indication that Shlomoh Sherman, who is white, and whose position also was

terminated because of the department's restructuring, was afforded a written statement of termination or informed of a right to appear before a grievance committee.  While it appears there is some ambiguity as to how the parties interpret ACLU's policy #527, there is no evidence that this ambiguity is material to the decision to restructure the department and terminate Plaintiff, or that the Defendants' interpretation is the result of discrimination.  Accordingly, Plaintiff fails to fulfill her burden to draw an inference of discrimination surrounding her termination, based on alleged violations of ACLU policies.

3. Similarity of Jobs

Plaintiff argues that her Computer Operator responsibilities were so substantially similar to those of the MIS Assistant that she should have been given the new job automatically, and the fact that she wasn't raises an inference of discrimination. (Pl.'s Mem. Law in Opp. at 39.)  Defendants counter that because the new position was so substantially different than Plaintiff's position, that under its AA Plan, the organization was required to post it and undergo a formal hiring process.  (Defs.' Mem. Law at 36.)

The question of whether the job was a substantially new

position or not is one in dispute.[11]  However, absent bad faith, "an employer who is sued on allegations of age discrimination is not compelled to submit the reasonableness of its employment criteria to the assessment of either judge or jury." Thornley v. Penton Publ., 104 F.3d 26, 29 (2d Cir. 1997) (citing Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir.), cert. denied, 474 U.S. 829, 106 S. Ct. 91, 88 L. Ed. 2d 74 (1985); Montana v. First Fed. Sav. and Loan Ass'n, 869 F.2d 100, 106 (2d Cir. 1989)).  See also Scaria v. Rubin, 117 F.3d 652, 655 (2d Cir. 1997) (per curiam) ("'This Court does not sit as a super-personnel department that reexamines an entity's business decisions.'" (quoting Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986)).

Accordingly, the Court declines to second-guess the business decisions of Montclair, who was Director of Finance and Administration, and Stein, who was Director of the MIS Department at the time the new position was created, without any evidence that their decision not to assign the new position automatically to Plaintiff was motivated by discrimination.  Furthermore, even

_____

[11] The Court notes that out of the eight responsibilities listed in the MIS Assistant position posting, Plaintiff argues that as Computer Operator, she had the same responsibilities as only two of them (assisting users with computer application questions and encrypting and copying data files), and while she "was not specifically responsible" for performing five of the other tasks, the Defendants "knew she was capable of doing so." (Pl.'s Opp. Mem. at 39-45.)

31

though Defendants did not automatically give her the position, they encouraged her to apply for it.


4. Comparison to Other Employees Whose Positions Changed

Plaintiff also argues that other similarly situated permanent status employees did not have to apply formally for job promotions, unlike Plaintiff, which infers discrimination. (Pl.'s Opp Mem. at 32.) Plaintiff cites Linda Gustaffson, Kenneth Hairston, and Sylvern Huckleman for this proposition. (Pl.'s Opp Mem. at 32-35.) Plaintiff states that these three ACLU employees' positions changed automatically without them having to apply formally for new jobs, even when their old jobs were eliminated. (Pl.'s Opp Mem. at 35.) Defendants argue that Montclair began enforcing the provision of the AA Plan that all new and vacant positions be posted in 1987, and the policy has been in effect ever since. (Defs' Reply Mem. at 24.) Therefore, at the time the MIS Assistant position was created, Plaintiff's situation was not similar to Hairston and Huckleman, who assumed their new positions without formally applying for them before 1987. (Defs' Reply Mem. at 24.) As for Gustaffson, Defendants argue that she submitted her resume and was interviewed for the job of Office Administrator, and when she received the new title

of Human Resources Director, she had already been performing the functions of the position, which is unlike Plaintiff's situation. (Defs' Reply Mem. at 25; Gustaffson Dep. at 15.)

The Court finds Plaintiff's case is distinguishable from the three she cites, for the reasons cited by the Defendants. Furthermore, it is clear that the other employees' new positions were promotions that involved almost exactly the same type of work and functions as their old positions.  Plaintiff cites no evidence that the MIS Assistant position would have been a promotion, and the conclusion cannot be drawn that the two positions involved the same type of work, based on the titles of "Computer Operator" and "MIS Assistant."

Again, even if Plaintiff was treated differently from other employees whose positions changed, she offers no evidence that such treatment was based on discrimination.  In fact, Hairston and Huckleman, whom Plaintiff cites as examples of other employees who were treated differently than she was, are racial minorities, and Huckleman was over the age of 40 when her position changed. (Gustaffson. Decl. ¶¶ 10,11.)


5. Training

Plaintiff alleges an inference of discrimination can be

33

drawn from the fact that Stein denied her "the opportunity to learn and use the new computers by excluding her from the training programs held in May and June of 2000." (Second Am. Compl. ¶ 50.) Plaintiff further alleges that "this formal training would have allowed plaintiff to remain qualified to work in the MIS department like the other employees who were included in the training sessions." (Second Am. Compl. ¶ 51.) Plaintiff also alleges that Jacobowitz "was required to attend the same training classes that plaintiff would have attended but for race and age discrimination." (Second Am. Compl. ¶ 57.) Defendants argue that the ACLU had no obligation to train Plaintiff for the MIS Assistant position or alter her duties to avoid eliminating her job or terminating her employment. (Defs.' Mem. Law at 33.) Defendants also argue that the fact that Plaintiff was not trained on Team Approach in May or July is not evidence of discrimination, because the training in July occurred after the Plaintiff was laid off, and the training in May occurred after she had been informed of her termination, and would have been pointless, considering the fact that she had not applied for the new position. (Defs.' Mem. Law at 46.)

It is undisputed that Plaintiff did not apply for the MIS Assistant position, and given that she did not apply for the position, and her last day of work was June 9, 2000, there would

seem to be little reason to train her in Team Approach in May.
Furthermore, she was not the only MIS employee who was not
invited to attend the training.  Accordingly, a reasonable fact-
finder could not find that Plaintiff was excluded from such
training purely as a result of Defendants' discrimination.


6. Futility of Applying for MIS Assistant Position

    Plaintiff argues that one of the reasons she did not apply
for the MIS Assistant position was that it would have been
"futile."  (Pl.'s Opp Mem. at 31.)  Plaintiff acknowledges that
under established discrimination case law, one is expected to
apply for a job in order to maintain a claim (Pl.'s Opp Mem. at
31), but she argues that certain exceptions exist where applying
for the position would be "futile." (Pl.'s Opp Mem. at 32.)
Plaintiff argues that because the MIS Assistant position was
posted on April 12, 2000, and the position was filled as of April
20, 2000, according to the memorandum from Gustaffson granting
approval to hire Jacobowitz, it would have been futile for her to
apply.  (Pl.'s Opp Mem. at 32.)  Defendants argue that the date
on the Memorandum from Gustaffson, of April 20, 2000, was a
typographical error, and that all correspondence with Jacobowitz,
who was hired for the position, occurred in May.  (Defs.' Reply

Mem. at 7-9.)

Plaintiff does not cite any source except the memorandum
itself, that the position was filled as of April 20, 2000, such
as testimony that Plaintiff had personal knowledge that
Jacobowitz had been hired in April, or deposition testimony from
those involved in the hiring process, or from Jacobowitz himself.
Stein's hiring request memorandum was dated May 26, 2000, she
received approval from Montclair to hire Jacobowitz on May 31,
2000, and Jacobowitz said that he sent his first email in
response to the job posting on May 9, 2000 and did not begin
working at the ACLU in June of 2000. A reasonable jury could not
find that Jacobowitz was hired on April 20, 2000. "The nonmovant
cannot escape summary judgment by vaguely asserting the existence
of some unspecified disputed material facts, or defeat the motion
through mere speculation or conjecture." Western World Ins. Co.
v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (quotations
omitted). Because there is no evidence whatsoever that Plaintiff
was discouraged from applying for the position because she knew
someone was already hired, her futility argument fails.[12]

_____

[12] Because Plaintiff did not apply for the MIS Assistant
position, the Court declines to address Plaintiff's related
arguments that she was qualified for the position or that
Jacobowitz's qualifications were inferior to hers. (Pl.'s 56.1
in Opp. ¶¶ 318-379; Pl.'s Opp. Mem. at 45-50.)

There is no question the Defendant ACLU was sloppy and careless in terms of how it handled Plaintiff's termination process: it did not provide Plaintiff with her termination in writing; did not advise her of any grievance procedure; apparently forgot to provide her with her severance package until well after the termination meeting; and used cover memoranda with inaccurate dates.  However, Plaintiff has failed to establish a prima facie case of discrimination, because she has failed to show that the circumstances surrounding her firing give rise to an inference of discrimination.

E. Nondiscriminatory Reason for Employment Action

Plaintiff has not met the minimal burden of establishing a prima facie case of discrimination, but even if Plaintiff had successfully demonstrated an inference of discrimination, the Defendants would prevail.  The burden would have shifted to the Defendants to offer a legitimate, nondiscriminatory reason for the adverse employment action.  Here, Defendants argue that the decision to fire Plaintiff was based on the legitimate, nondiscrimanatory reason that her computer operator position, along with the HP Programmer's, was eliminated as a result of a restructuring in the MIS Department that occurred when the ACLU

replaced its fundraising computer system. (Defs.' Mem. Law at 3.)

This Circuit has determined that an employer's decision to restructure may be a legitimate, nondiscriminatory reason for an adverse employment action. See Dister v. Continental Group, Inc., 859 F.2d 1108, 1116 (2d Cir. 1988). Without second-guessing the wisdom of corporate business decisions, courts must "nevertheless judge whether the proffered explanation in light of all the circumstances is a rational one." Tarshis v. Riese Org., 211 F.3d 30, 37 (2d Cir. 2000) (citation omitted). The facts surrounding the ACLU's decision to restructure its information technology system and replace its HP System with Team Approach are consistent with nondiscriminatory conduct and appear to the Court to be eminently rational. While a reasonable jury might conclude that an employer's business decision was so lacking in merit "as to call into question its genuineness" (Dister, 859 F.2d at 1116), that is not the case here.

F. Pretext

If Plaintiff had properly established a prima facie case, and where as here, the Defendants have alleged a nondiscriminatory reason for firing the Plaintiff, the burden would shift back to the Plaintiff to demonstrate by a

preponderance of the evidence why the reason stated by Defendants is merely a pretext for discrimination. To create a genuine issue of material fact at this stage requires a plaintiff to present sufficient evidence to show that the employer's asserted justification for the adverse action is false. See Burdine, 450 U.S. at 253; Chertkova, 92 F.3d at 87. Such evidence "may permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves, 530 U.S. at 148.

Besides the circumstantial evidence used to argue her prima facie case, the only argument Plaintiff makes in this regard is that the restructuring was

> not a legitimate business reason for terminating plaintiff because the ACLU and Stein intentionally made plaintiff unqualified to remain in the MIS department without the necessary training that her fellow MIS employees received along with Eli Jacobowitz. Defendants ACLU and Stein could have altered Ms. Torres' job duties to reflect what appears to be needed in the job listings and given her the necessary training as oppose [sic] to terminating her.

(Second Am. Compl. ¶ 40.) Plaintiff's argument regarding her exclusion from training already was addressed and disposed of in discussing Plaintiff's prima facie case. Even examining all of Plaintiff's evidence cumulatively, Plaintiff fails to show how Defendants' asserted justification for firing her is false and instead is based on discrimination, and therefore, fails to meet

her burden of persuasion.  Accordingly, Defendants' Motion for Summary Judgment is GRANTED.

## III. CONCLUSION

The Court has reviewed Defendants' Motion for Summary Judgment in this matter.  Plaintiff has failed to establish a prima facie case of discrimination, and furthermore has not established that Defendants' proffered reason for Plaintiff's firing was a pretext, nor has she identified any genuine issues of material fact.  Accordingly, Defendants' Motion for Summary Judgment is GRANTED.  The Clerk of the Court is directed to close the case.

SO ORDERED.

Dated:    New York, New York
          July 22, 2005

                                    _DEBORAH A. BATTS_
                                    DEBORAH A. BATTS
                                    United States District Judge